# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

| | |
|---|---|
| CC METALS AND ALLOYS, LLC, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 5:22-CV-055-CHB |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION &** |
| AMERICAN INTERNATIONAL ) | **ORDER** |
| SPECIALTY LINES INSURANCE ) | |
| COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |

*** *** *** ***

This matter is before the Court on Defendant American International Specialty Insurance ("AIG Specialty") and Fortitude Reinsurance Company Ltd.'s ("Fortitude Re") Partial Motion to Dismiss. [R. 18].[1] Plaintiff CC Metals and Alloys, LLC ("CCMA") responded [R. 28], and Defendants replied [R. 32]. CCMA later sought leave to file a sur-reply [R. 36], which the Court granted [R. 38] and contemporaneously entered CCMA's Sur-Reply in Opposition to Defendants' Partial Motion to Dismiss [R. 39] into the record. Defendants then moved for leave to respond to CCMA's Sur-Reply. [R. 40]. CCMA responded in opposition [R. 42], and Defendants did not reply.

For the reasons set forth below, the Court will grant Defendants' Motion for Leave to File Response to Plaintiff's Sur-Reply in Opposition to Defendants' Partial Motion to Dismiss [R. 40] and will deny Defendants' Partial Motion to Dismiss [R. 18].

---

[1] On October 12, 2022, the Chief Judge reassigned this case from Judge Thomas Russell to the undersigned pursuant to General Order 22-12. *See* [R. 46].

I. **BACKGROUND**

This case involves an insurance coverage dispute between CCMA and the Defendants "with respect to losses suffered by CCMA arising from pollution-related clean-up costs at its Calvert City, Kentucky site." [R. 1, p. 2]. CCMA is a limited liability company that produces and supplies ferrosilicon alloys used in the manufacturing of iron and steel. *Id.* at 6. In 2003, AIG Specialty issued CCMA a Pollution Legal Liability Select Clean-Up Cost Cap Insurance Policy (the "Policy"), specifically for "Pollution Legal Liability Coverage" and "OM&M Cost Cap Coverage" until December 2023, and "Capital Expenditure Cost Cap Coverage" until December 2010. [R. 1-1, p. 2]. CCMA has named Fortitude Re as a party to this action based on information and belief that AIG Specialty has "transferred all assets, liabilities, and obligations related to the Policy [] to Defendant Fortitude Re." [R. 1, p. 6]. Judge Russell previously denied Defendant Fortitude Re's Motion to Dismiss all CCMA's claims against it [R. 17], finding that CCMA had "provided a plausible argument for Fortitude Re's potential liability." [R. 44, p. 7].

CCMA's Complaint states that the Policy was designed to cover the costs to implement and comply with a Remedial Plan created by CCMA and LAN Associates Inc. ("LAN"), a company that "provides environmental, health, safety, and land planning/development services," and to cover any future liabilities CCMA may face based on alleged pollution conditions. [R. 1, p. 3]. The Remedial Plan was developed to clean up pollutants at the Calvert City location and, according to CCMA, "[f]or almost 18 years following the implementation of the Remedial Plan and issuance of the Policy by AIG, the Defendant Insurers paid, on a routine basis, all submitted costs incurred by CCMA to implement the Remedial Plan." *Id.* In October 2020, however, CCMA alleges AIG Specialty "changed its position and began to deny reasonable and necessary OM&M Costs incurred by CCMA to comply with the Remedial Plan." *Id.* CCMA's complaint also claims

the Division of Waste Management for the Kentucky Department for Environmental Protection ("KDEP") conducted an investigation into the potential pollutants in the riverbank near CCMA's Calvert City location, resulting in the need for LAN to "formulate[] and implement[] a characterization plan to assess environmental risk at the Site." *Id.* at 4.

After KDEP approved the Final Site Characterization and Risk Assessment Report created by LAN, CCMA contends it received "an official written demand [] requesting that CCMA submit a corrective action plan to ensure compliance with the Remedial Plan." *Id.* The Complaint states that, "on March 29, 2021, CCMA gave written notice to AIG that CCMA/LAN must prepare a corrective action plan for the Site in response to the KDEP Claim." *Id.* According to CCMA, KDEP approved the corrective action plan (the "Management Plan") which aimed to "manage pollutants at the Site, eliminate exposure/risk to contaminants of potential concern, reduce the formation of perched water, and stop erosional transport of materials and maintain existing engineering controls." *Id.* at 5. CCMA's Complaint claims "Defendant Insurers have failed and or refused, in breach of the Policy, to assess whether PLL Coverage extends to the KDEP Claim" after "the Defendants disclaimed any duty to provide a coverage opinion prior to the work being performed." *Id.*

CCMA has sued both Defendants for breach of contract, breach of the duty of good faith and fair dealing, and violation of the Unfair Claims Settlement Practices Act under KRS § 304.12-230 (UCSPA). *See generally* [R. 1]. CCMA also seeks a declaratory judgment "declaring that its Claims and the losses CCMA has suffered are covered under the Policy." *Id.* at 35. Defendants now move to dismiss CCMA's bad faith claims and any that "relate to a set of unidentified, speculative, future costs that have not been incurred." [R. 18, pp. 1–2].

II.     ANALYSIS

### A. DEFENDANTS' MOTION FOR SUR-SUR-REPLY

The previously assigned district judge granted CCMA's Motion for Leave to File Sur-Reply "based on new information" Defendants sent to CCMA "[a]pproximately sixteen days after filing [their] Reply[.]" [R. 38, p. 1]; [R. 39, p. 2]. In its Sur-Reply, CCMA explains that prior to the date Defendants filed their reply, CCMA submitted invoices for work completed under the Management Plan. [R. 39, p. 2]. After tendering the reply, on July 7, 2022, Defendants sent CCMA a letter denying coverage for those costs. *Id.* CCMA suggests this letter "demonstrates that a controversy in the form of a coverage dispute is ripe for adjudication," undercutting Defendants' argument that CCMA's claims for future costs should be dismissed. *Id.* at 3. CCMA also believes the denial letter demonstrates that "Defendants' Motion to Dismiss and Reply both rely on factual assertions that . . . are clearly inaccurate or blatantly false." *Id.*

Defendants suggest they should be permitted to respond to CCMA's Sur-Reply because it "either grossly misunderstands the basis for the Partial Motion [to Dismiss] or is intentionally attempting to mislead the Court on the issues." [R. 40, p. 1]. According to Defendants, the July 2022 denial letter is "irrelevant" to its Partial Motion to Dismiss, which only seeks dismissal of "claims for future costs that have not yet been incurred by CCMA and denied by AIG Specialty, not claims for incurred costs for which AIG Specialty has denied coverage." *Id.* at 2. Indeed, Defendants' Motion requests dismissal of "the portions of Plaintiff's Claims that relate to a set of unidentified, speculative, future costs that have not been incurred or tendered to AIG Specialty." [R. 18, p. 2].

This Court's Local Rules do not provide for the filing of supplements to dispositive motions. Instead, "proper motion practice under the local rules contemplates only motions, responses, replies and memoranda." *Gen. Elec. Co. v. Latin Am. Imports, S.A.*, 187 F. Supp. 2d

749, 752 n.1 (W.D. Ky. 2001). "[T]he question of whether to permit [a sur-reply] is a matter left to the broad discretion of the trial court." *Carter v. Paschall Truck Lines, Inc.*, 364 F. Supp. 3d 732, 748 (W.D. Ky. 2019). "The Court does not permit surreplies, and certainly not sur-surreplies, as a matter of course." *First Tech. Cap., Inc. v. BancTec, Inc.*, No. 5:16-CV-138-REW, 2017 WL 2734716, at *2 (E.D. Ky. June 26, 2017). A motion for leave to file a sur-reply, "when utilized for the purpose of supplementing argument on pending motions, should be used sparingly," *Gen. Elec. Co.*, 187 F. Supp. 2d at 752 n.1., such as "when new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated." *Carter v. Paschall Truck Lines, Inc.*, 364 F. Supp. 3d 732, 748 (W.D. Ky. 2019) (internal citations and quotation marks omitted).

Here, CCMA sought to file a sur-reply not because Defendants submitted new evidence or arguments in their reply, but because it received new evidence after briefing on the Partial Motion to Dismiss had concluded. Thus, CCMA's ability to respond to new evidence as the non-movant had not been vitiated by Defendants' reply; rather, CCMA sought to sur-reply because of the apparent relevance of the new evidence to the underlying motion. The Court finds that in fairness, because Defendants could not have anticipated nor addressed CCMA's arguments surrounding the denial letter, a sur-sur-reply is appropriate here. *See Novartis Corp. v. Webvention Holdings, LLC*, No. CCB-11-3620, 2016 WL 3162767, at *2 n.3 (D. Md. June 7, 2016) (considering a sur-sur-reply only because "[the moving party] could not have addressed [new] surreply arguments"). Defendants' Motion for Leave to File Sur-Sur-Reply [R. 40] is **GRANTED** and the Court will consider the Sur-Sur-Reply [R. 40-1] in assessing their Partial Motion to Dismiss.

B.  **DEFENDANTS' PARTIAL MOTION TO DISMISS**

Defendants move to dismiss Counts III (Breach of the Duty of Good Faith and Fair Dealing) and IV (Violation of the Unfair Claims Settlement Practices Act, KRS § 304.12-230) of CCMA's Complaint because they "fail[] to assert sufficient factual allegations to support an essential element of [the] claims: that Defendants acted with intent to harm or that their conduct was outrageous and recklessly indifferent to CCMA's rights." [R. 18, pp. 1–2]. Defendants also move to dismiss "the portions of Plaintiff's Claims that relate to a set of unidentified, speculative, future costs that have not been incurred or tendered to AIG Specialty" since "there is no controversy between the parties" with regard to those costs or for work "CCMA has not performed." *Id.* at 2.

1. **Failure to State a Claim for Breach of the Duty of Good Faith and Fair Dealing and for Violation of the Unfair Claims Settlement Practices Act**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" if the factual allegations in the complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Further, "[t]he complaint is viewed in the light most favorable to [Plaintiff], the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in [Plaintiff's] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016) (citing *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)).

Defendants first argue CCMA's breach of the duty of good faith and fair dealing (i.e., common law bad faith) and UCSPA violation (i.e., statutory bad faith) claims should be dismissed because the Complaint "does not assert a single *fact* regarding Defendants' conduct that would warrant a punitive damages award," which is "[a]n essential element of both" claims. [R. 18, pp. 10, 6–7] (emphasis in original). They suggest CCMA "failed to plead any facts suggesting Defendant's conduct was sufficiently outrageous or reckless as to warrant punitive damages, relying only on unsupported conclusory allegations." [R. 18, p. 12]. In response, CCMA argues its Complaint contains "clear and thorough factual allegations regarding the Defendants' conduct, relevant events, and communications," and "adequately sets forth specific bad faith conduct that, if taken as true, sets forth a cognizable claim that would warrant punitive damages under Kentucky law." [R. 28, pp. 2, 6].

"Implicit in every contract in Kentucky is the covenant of good faith and fair dealing." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 816 (E.D. Ky. 2013) (citations omitted). "[I]t is well-settled that independent tort claims for breaches of duty of good faith and fair dealing are only permitted where a special relationship exists between

the parties . . . [and] Kentucky courts have only recognized the existence of such a relationship in the context of insurance contracts." *Id.* (internal citations and quotation marks omitted).

The UCSPA "'comprehensively defines misleading insurance investigative practices and prohibits insurers from engaging in certain activities in the course of settling claims' [and] 'requires insurers to negotiate reasonably with respect to claims.'" *Little v. Butler*, No. 7:19-CV-114-REW-EBA, 2020 WL 2765762, at *2 (E.D. Ky. May 28, 2020), *appeal dismissed*, No. 20-5713, 2020 WL 7706405 (6th Cir. Sept. 29, 2020) (quoting *Hollaway v. Direct Gen. Ins. Co. of Miss.*, 497 S.W.3d 733, 737, 739 (Ky. 2016)). "Prohibited activities include 'refusing to pay claims without conducting a reasonable investigation based upon all available information' and 'not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.'" *Id.* (quoting KRS §§ 304.12-230(4), (6)). Even so, "[a]n insurer may challenge a claim and litigate it if the claim is debatable on the law or the facts without running afoul of the UCSPA." *Nationwide Mut. Fire Ins. Co. v. Castle*, No. 13-25-ART, 2013 WL 5503056, at *4 (E.D. Ky. Oct. 2, 2013) (internal citation and quotation marks omitted).

To establish a claim for common law or statutory bad faith under the UCSPA, the insured must show:

> (1) the insurer is obligated to pay the claim under the terms of the policy;
> (2) the insurer lacks a reasonable basis in law or fact for denying the claim; and
> (3) the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). Because "[a] bad faith claim under Kentucky law is, essentially, a punitive action," *Hollaway v. Direct Gen. Ins. Co. of Miss.*, 497 S.W.3d 733, 739 (Ky. 2016), the third element "requires evidence that the insurer's conduct was outrageous, or

because of his reckless indifference to the rights of others." *Bowlin Grp., LLC v. Rebennack*, 626 S.W.3d 177, 188 (Ky. Ct. App. 2020).

As noted above, the Court must view the Complaint "in the light most favorable to [Plaintiff]" and accept the allegations in the complaint as true. *Gavitt*, 835 F.3d at 639–40 (citation omitted). Further, "[i]n judging the sufficiency of the complaint [the Court is] bound to indulge in all reasonable inferences which might be drawn therefrom." *Fitzke v. Shappell*, 468 F.2d 1072, 1076 n.6 (6th Cir. 1972). Here, the Complaint clearly sets forth facts that, if taken as true, meet the first and second elements of CCMA's bad faith claims: (1) coverage under the policy and (2) lack of a reasonable basis for denial. The Complaint cites specific policy language,[2] explains the purpose and scope of coverage generally, and details AIG's obligation to cover certain identified costs under the Policy.[3] The Complaint further alleges that "AIG has no legitimate or reasonable basis under the Policy to refuse payment for covered OM&M Clean-Up Costs incurred or to be incurred," because "the unreimbursed costs in dispute fall within the Policy's plain meaning of 'operations maintenance and monitoring' as a reasonable and necessary expense required to satisfy the Remedial Plan." *Id.* at ¶¶ 126, 134. It states that "because the KDEP Claim directly concerns

---

[2] The Policy is also attached to CCMA's Complaint as Exhibit A. *See* [R. 1-1, Ex. A ("Policy")].
[3] *See, e.g.*, [R. 1, ¶¶ 4–6] ("The Policy provides (1) Cost Cap Coverage for Operations, Maintenance and Management ('OM&M') Expenditures ('OM&M Coverage') and (2) Pollution Legal Liability ('PLL') Coverage. . . . With respect to the OM&M Coverage, the Policy provides coverage for Clean-Up Costs for 'Known Pollutants' as identified in the Risk Reduction Plan . . . as well as the Clean-Up Costs for other 'Unknown Pollutants[.]' . . . With respect to the PLL Coverage, the Policy provides coverage for claims made against CCMA due to environmental Pollution Conditions[.]"); *id.* at ¶ 9 ("The policy was put in place in part to (1) cover the costs to implement and comply with the Remedial Plan on a going-forward basis (OM&M Coverage); and (2) cover any future claims for liability made against CCMA based on alleged pollution conditions (PLL Coverage)."); *id.* at ¶ 12 ("CCMA executed the Remedial Plan to clean up pollutants at the Site and shortly thereafter took out the Policy to cover all costs incurred in order to comply with the Remedial Plan, including (but not limited to) costs associated with the clean-up of pollutants and any claims made regarding pollutants."); *id.* at 126 ("Because the unreimbursed costs in dispute fall within the ordinary Policy's plain meaning of 'operations maintenance and monitoring' as a reasonable and necessary expense required to satisfy the Remedial Plan, the costs are covered and should be reimbursed by Defendants pursuant to the Policy.").

remediation relating to groundwater and surfacewater and/or stormwater, and because KDEP has directly cited Environmental Laws which obligate CCMA to execute remediation work per the Management Plan, a covered Claim under the Policy has been made." *Id.* at ¶ 161.

Drawing all reasonable inferences in its favor, the Court finds CCMA has provided sufficient factual allegations to meet the first two elements of its bad faith claims. And while Defendants do not directly concede the same, they do not challenge the sufficiency of CCMA's Complaint on those grounds. Rather, Defendants' argument for dismissal centers on the third element of bad faith. *See* [R. 18, p. 12 ("CCMA has failed to plead any facts suggesting Defendant's conduct was sufficiently outrageous or reckless as to 'warrant punitive damages,' relying only on unsupported conclusory allegations. Thus, CCMA fails to state a claim for common law and statutory bad faith.")]. Turning, then, to the third element, knowledge that there was no reasonable basis for denying a claim or reckless disregard for whether such a basis existed, the Court finds that CCMA's Complaint is likewise sufficient.

The Complaint alleges Defendants "acted in bad faith by wrongfully and unreasonably failing and or refusing to provide coverage under the Policy for the OM&M Claim and the KDEP Claim" and that they "knew or acted recklessly as to whether a reasonable basis existed to deny or delay payment" of the Claims. [R. 1, ¶¶ 206, 134–35]. It asserts that AIG "consistently reimbursed *identical* cost[s]" for approximately eighteen years, then "alter[ed] its course of conduct to unreasonably deny the very same types of OM&M Costs it had approved for nearly two decades." *Id.* at ¶¶ 71, 132–133 (emphasis in original). According to CCMA, "[t]he fact that the Defendants abruptly altered their 'prior course of performance' demonstrates that they knew there was no reasonable basis for denying coverage or, at a minimum, acted with reckless disregard in denying coverage." [R. 28, p. 10 (citing [R. 1, ¶ 68])]. This "unreasonable position," in CCMA's view,

"obstructs the Policy's purpose, is in direct contrast to the parties' prior course of conduct, and is a violation of Defendants' obligations under the Policy" and was "solely motivated by Defendants' efforts to protect their own financial interest." [R. 1, ¶¶ 130, 131].

The Complaint specifically alleges that "although AIG was aware that a 'Claim' under the Policy had been made against CCMA by KDEP, and although AIG covered some costs incurred to prepare the Management Plan, by letter on June 2, 2021, AIG refused to formally assess or provide coverage for the KDEP Claim." [R. 1, ¶ 90]. CCMA submits that "KDEP's demand . . . is precisely the type of event that motivated CCMA to purchase PLL Coverage in the first place." [R. 28, p. 11]; *see also* [R. 1, ¶ 167 ("PLL Coverage also exists . . . for the KDEP Claim because the Policy defines Property Damage to include Natural Resource damage, which are the precise damages at issue in the KDEP Claim.")].

With regard to the OM&M claim, the Complaint also alleges that, on November 16, 2020, "CCMA sent a letter to AIG further explaining and emphasizing why the disputed costs were reasonable and necessary under the Remedial Plan in an attempt to clarify why the work must be completed and why the costs should be covered under the Policy." *Id.* at ¶ 71. After AIG again refused to provide coverage, the Complaint provides that on September 15, 2021, "CCMA's counsel sent a letter to AIG wherein CCMA provided formal notice that it was disputing coverage regarding AIG's failure to reimburse reasonable and necessary OM&M costs under Coverage 1 of the Policy" and "asked AIG to reconsider its [] position with regard to its obligation to cover the OM&M Expenditures[.]" *Id.* at ¶ 73, 74. According to the Complaint, AIG sent CCMA a letter "affirmatively stat[ing] that it would not provide coverage for the unreimbursed OM&M expenses, now or in the future[.]" *Id.* at ¶ 75.

Indulging "in all reasonable inferences which might be drawn" from CCMA's Complaint, the Court finds its bad faith claims are facially plausible. *Fitzke*, 468 F.2d at 1076 n.6; *Iqbal*, 556 U.S. at 678 (citation omitted). CCMA has set forth facts that, if true, demonstrate that AIG denied coverage for claims plainly covered under the Policy. CCMA has alleged that after it pointed AIG to written directives from the KDEP regarding necessary clean-up, invoices documenting the costs expended in the Remedial Plan's development and clean-up efforts, and previous instances where AIG reimbursed the same type of costs, AIG nevertheless denied coverage. Contrary to Defendants' assertion otherwise, these are factual allegations, not legal conclusions. Accepting these facts as true and viewing CCMA's Complaint "in the light most favorable to [it]," it is plausible that AIG acted with reckless indifference to CCMA's rights under the Policy. *Gavitt*, 835 F.3d at 639–40. Defendants position that, even if they "changed their position regarding payment or coverage for certain categories of costs . . . that change in position is not outrageous conduct and the allegation does not provide factual support for the bad faith claims." [R. 31, p. 6]. That may be, but if no reasonable basis existed for such a change, as CCMA alleges, and AIG knew or acted with reckless disregard as to CCMA's rights under the policy in making the change, such conduct may have been "outrageous" under Kentucky law. *See Wittmer*, 864 S.W.2d at 890; *Bowlin Grp.*, 626 S.W.3d at 188.

The parties both rely on *Little v. Butler* to support their respective positions. *See* [R. 18, p. 12 ("[J]ust as the court[] in *Little* . . . did, this Court should dismiss CCMA's Third and Fourth Causes of Action for common law and statutory bad faith.")]; [R. 28, p. 12 ("The *Little* case has no resemblance to the Claims as alleged here, because the CCMA Complaint thoroughly acknowledges the necessary elements and alleges facts to both directly and inferentially support

the elements.")]. In *Little*, the court found dismissal was warranted because the plaintiff had "not plausibly alleged a violation of the UCSPA." 2020 WL 2765762, at *3. The court explained:

> The complaint's factual allegations are reedy; the complaint identifies only the insured (Little), and the policy number, and the relevant insured event (the August 31, 2018, collision). Little does not identify the underlying disputed claim, much less explain what led to the (apparent, but unstated) denial or describe any relevant communications with her insurer. Moreover, the complaint does not allege or support that GEICO General was obligated to pay Little's (unspecified) claim under the policy, that GEICO General lacked a reasonable basis to deny the claim, or that GEICO General knew or acted with reckless disregard as to the lack of such basis. Furthermore, the complaint does not suggest that GEICO General's conduct was outrageous, or because of its reckless indifference to the rights of others.

*Id.* (cleaned up). CCMA's Complaint is distinguishable from the plaintiff's complaint in *Little*. Here, as previously stated, CCMA detailed each element of its bad faith claim and provided sufficient, specific factual allegations to support them. It specifically identified the underlying disputed claims (i.e., the KDEP and OM&M Claims) and provided detailed background information explaining what led to the denial, including the parties' longstanding relationship, similar claims historically approved by AIG, and communications between it and AIG regarding the disputed claims and the policy generally.

Defendants also liken this case to *Nationwide Mutual Fire Insurance Co. v. Castle*, where the court dismissed the defendant-insured's four-paragraph bad faith counterclaim that merely asserted "legal conclusions posing as facts," No. CIV. 13-25-ART, 2013 WL 5503056 at *1 (E.D. Ky. Oct. 2, 2013), and *Anderson v. Standard Insurance Co.*, where the court dismissed the plaintiff's complaint because it only "generally point[ed] [the] Court to seven paragraphs of the Complaint, many of which [were] also simply legal conclusions" without "any facts anywhere in the pleadings." No. 3:14-CV-00051-H, 2014 WL 5366117, at *3 (W.D. Ky. Oct. 21, 2014). In

contrast, as discussed above, CCMA's forty-page Complaint contains detailed factual support for its bad faith claims and does not merely assert legal conclusions.

In sum, CCMA's Complaint states plausible claims for relief for both common law and statutory bad faith and contains sufficient factual support to survive dismissal at this stage. The Court will therefore deny Defendants' motion to dismiss those claims.

### 2. Justiciability of Plaintiff's Claims for Future or Potential Costs

Defendants also argue CCMA's Complaint "seeks a declaration of coverage for unidentified, speculative, potential future costs that may be incurred to comply with the Management Plan, and asserts claims for breach of contract and common law and statutory bad faith arising out of Defendants' failure to (commit to) provide coverage for and pay these un-incurred, speculative costs." [R. 18, p. 13]. CCMA suggests Defendants' justiciability argument is "contradictory . . . because the Defendants specifically dispute coverage for past, present and future costs[.]" [R. 28, p. 2 (citing [R. 18, p. 15 n.5 ("Defendants dispute that any requests made by the KDEP constitute a 'Claim' under the Policy.")])].

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1146 (2013). "The case or controversy requirement has engendered numerous justiciability doctrines that further define the limits of federal jurisdiction, including the ripeness doctrine." *Genesis Brand Seed, Ltd. v. Limagrain Cereal Seeds, LLC*, 944 F. Supp. 2d 564, 568 (W.D. Mich. 2013) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). The ripeness doctrine "'prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Thomas*, 473 U.S. at 580 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, (1967)).

In the Sixth Circuit, courts consider three factors to determine whether a claim is ripe for review: (1) the likelihood that the harm alleged will ever come to pass, (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims, and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings. *Adult Video Ass'n v. United States Dep't of Justice*, 71 F.3d 563, 568 (6th Cir. 1995). Courts should "pay particular attention" to the first factor. *United Steelworkers of Am. Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194–95 (6th Cir. 1988) (citing *Thomas*, 473 U.S. at 580–81). The burden is on the party seeking to invoke jurisdiction to "demonstrate a realistic danger of sustaining a direct injury." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). However, "'[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Id.* (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)).

> In the context of declaratory judgments, the Supreme Court has observed,
>
> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "A case is ripe for pre-enforcement review under the Declaratory Judgment Act only if the probability of the future event occurring is substantial and of 'sufficient immediacy and reality[.]'" *Gen. Ret. Sys. of City of Detroit v. Snyder*, 822 F. Supp. 2d 686, 694 (E.D. Mich. 2011) (quoting *National Rifle Assoc. of America v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997)). "Declaratory judgment actions . . . often require courts to face the difficult task of distinguishing 'between actual controversies and attempts

to obtain advisory opinions on the basis of hypothetical controversies.'" *Sankyo Corp., et al. v. Nakamura Trading Corp.*, 139 Fed. Appx. 648, 651 (6th Cir. 2005) (quoting *Kardules v. City of Columbus*, 95 F.3d 1335, 1343–44 (6th Cir. 1996)).

In its sur-reply, CCMA offers that the justiciability of its claims for future costs "cannot be fairly decided without considering Defendants' [July 7, 2022 coverage denial letter], which, consistent with Plaintiff's Complaint and Response Brief, demonstrates that a controversy in the form of a coverage dispute is ripe for adjudication." [R. 39, p. 3]. In essence, CCMA suggests Defendants strategically timed the transmission of their denial letter so they could represent to the Court that they had not yet "accepted or denied coverage" for the KDEP claim and deny such coverage shortly after.

In their sur-sur-reply, Defendants claim they "did not falsify or hide facts" and "specifically contemplated that Plaintiff would eventually submit invoices for KDEP Claim costs during the litigation and accounted for this scenario" by suggesting, "[i]f and when costs are incurred, and if AIG Specialty denies coverage for those costs, the Complaint can be amended to assert a claim for costs actually incurred pursuant to the Management Plan." [R. 40-1, p. 3]. Contrary to CCMA's suggestion otherwise, Defendants believe "[t]he July Letter is further evidence of why claims for future costs are not ripe for adjudication: costs cannot be adequately evaluated for coverage until actually tendered . . . and . . . a coverage decision can be made." *Id.* at 4.

Here, considering the Sixth Circuit's *Adult Video* factors, the Court finds that CCMA's claims related to future costs are ripe for review. First, it is all but certain that CCMA's alleged harm will come to pass, since CCMA has already alleged "past and present" harm stemming from AIG's denial of the same type of claims under the Management Plan. Indeed, CCMA's "threatened injury" with regard to the future claims is so imminent that it has already begun to materialize, as

the July 2022 denial letter demonstrates, and will likely continue to as this lawsuit progresses. Defendants' proposed solution for addressing these claims as they ripen—that CCMA should simply file an amended complaint if and when any "future, speculative, and yet-undetermined costs" become disputed—underscores both the imminence and inevitability of such a dispute. Moreover, it would be impractical and wasteful of all parties' resources to require CCMA to amend its complaint, which would then require an amended answer, each time it submits a new claim that is denied by AIG. This would create unnecessary hardship for CCMA in particular, but for Defendants as well. The Court therefore finds that CCMA's claims for declaratory relief concerning future costs are ripe for consideration.

Defendants cite to *Toledo Newspaper Unions-Blade Pension Trust Fund v. Federal Insurance Co.*, where the Northern District of Ohio granted an insurer's motion to dismiss a declaratory judgment action as unripe because the plaintiff sought "an impermissible advisory opinion concerning issues that could, in the future, bear fruit," No. 3:07-CV-2590, 2008 WL 11433474, at *1 (N.D. Ohio Feb. 28, 2008), *aff'd*, 318 Fed. App'x. 347 (6th Cir. 2009), to support their position that CCMA's claims "do not arise in a concrete factual context." [R. 18, p. 14]. In *Toledo*, the plaintiff asked the court to determine whether its trustees "had an ERISA duty to notify its participants of a potential claim." 2008 WL 11433474 at *2. In that case, there was "no adverse party or actual dispute with respect to the potential duty to notify, and the [plaintiff] demonstrated no 'injury in fact' as is required to establish an actual case or controversy." *Id.* As the court recognized, "[f]ederal jurisdiction cannot exist unless the conflicting contentions of the parties . . . . present a real, substantial controversy between the parties having adverse legal interests." *Id.* Such conflicting contentions are plainly present here and, as previously stated, CCMA's alleged harm is imminent. The Court finds that CCMA's request for declaratory relief is just that—it is

not, as Defendants contend, an attempt to obtain "an impermissible advisory opinion." [R. 18, p. 14].

Lastly, Defendants briefly argue that, for the same reasons that CCMA's claims related to future costs are not ripe, CCMA lacks standing to assert such claims:

> CCMA has not suffered any damages as a result of its claims for future costs because (1) it has not incurred or paid the future costs pled in its Complaint and (2) AIG Specialty has not denied coverage for any future costs. Any potential injury is purely hypothetical for the same reasons: in order to suffer damage, it must have actually incurred costs, which may or may not occur for the reasons discussed in Section B.1., and Defendants must have denied the costs, which may or may not occur and will depend on the nature and amount of costs actually incurred, if any.

[R. 18, pp. 17–18]. For the same reasons discussed above, the Court finds there is a high probability that CCMA will submit (and AIG will deny) future claims for the same or similar costs that AIG has previously denied, that its alleged injury is therefore imminent, and its claims are not "purely hypothetical." The Court is unconvinced by Defendants' argument that CCMA lacks standing and will deny Defendants' motion to dismiss CCMA's claims for a declaratory judgment on future costs.

### III. CONCLUSION

**IT IS HEREBY ORDERED** as follows:

1. Defendants' Motion for Leave to File Response to Plaintiff's Sur-Reply in Opposition to Defendants' Partial Motion to Dismiss [**R. 40**] is **GRANTED**.

2. Defendants' Partial Motion to Dismiss [**R. 18**] is **DENIED**.

This is the 28th day of November, 2022.

*Claria Horn Boom*
CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY